## Nos. 22-10164-A & 22-10782-A

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
*Plaintiff/appellee*,

**v.**

EDWARD WALKER,
*Defendant/appellant.*

———————————

On Appeal from the United States District Court
for the Southern District of Florida

———————————

INITIAL BRIEF OF APPELLANT EDWARD WALKER

———————————

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER
ANDREW L. ADLER
ASS'T FEDERAL PUBLIC DEFENDER
Attorneys for Appellant
1 E. Broward Blvd., Suite 1100
Ft. Lauderdale, FL 33301
(954) 356-7436

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL CASE)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

## United States v. Edward Walker
## Case Nos. 22-10164-A & 22-10782-A

Appellant files this Certificate of Interested Persons and Corporate

Disclosure Statement, as required by 11th Cir. R. 26.1.

Abrams, Stewart G.

Adler, Andrew L.

A.H.

Aljani-Macri, Huda

Becerra, Hon. Jacqueline

Berube, Robert N.

Caruso, Michael

Cervantes, Daniel

Cohn, Hon. James I.

Dion, Scott

Dobbins, Brian

Ecarius, Daniel

Fajardo Orshan, Ariana

Gonzalez, Juan Antonio

J.B.

Lacosta, Anthony W.

Lopez, Alejandra L.

McAliley, Hon. Chris M.

Michelen, Juan J.

Moore, Hon. K. Michael

O'Sullivan, Hon. John J.

Reboso, Manolo

Reid, Hon. Lisette M.

Rubio, Lisa Tobin

S.K.

Silverstein, Joan

Singhal, Hon. Raag

Smith, II, Jan C.

Strauss, Hon. Jared M.

United States of America

Walker, Edward

Zloch, William T.

## STATEMENT REGARDING ORAL ARGUMENT

This appeal is from a seven-day sex-trafficking trial. The voluminous record and the legal issues on appeal warrant oral argument.

At trial, there was no dispute that Mr. Walker was a pimp. But there was also no dispute that he never used or threatened to use any physical force. That made this an unusual case; the prosecution argued only that Mr. Walker "coerced" two victims to engage in prostitution.

For one (adult) victim, the government advanced a novel theory of "coercion." Essentially, it argued that Mr. Walker "coerced" her to engage in prostitution by declining to pay her way home after she stopped having fun on a vacation that she had voluntarily joined. Whether such conduct constitutes "coercion" is an issue of first impression anywhere.

For a second (minor) victim, the government's theory of "coercion" depended on expert testimony by the case agent, the government's main witness at trial. As an "expert" on sex trafficking, he opined that pimps often use romantic/sexual relationships to persuade women to engage in prostitution. But neither that key testimony nor its underlying basis was disclosed pre-trial. That failure was a clear violation of Rule 16(a)(1)(G). And that discovery violation substantially prejudiced the defense.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CITATIONS .............................................................. iii

STATEMENT OF JURISDICTION .................................................. 1

STATEMENT OF THE ISSUES ...................................................... 2

STATEMENT OF THE CASE ........................................................ 3

    I.    Course of Proceedings & Disposition Below ............................. 3

    II.    Statement of Facts .......................................................... 5

    III.    Standards of Review ....................................................... 7

SUMMARY OF THE ARGUMENT ................................................. 8

ARGUMENT AND CITATIONS TO AUTHORITY ................................ 9

    I.    Count 1 Should Be Reversed Because There Was Insufficient Evidence of "Coercion" ........................................... 11

        A.    The Law ................................................................ 11

        B.    The Facts ............................................................... 15

        C.    The Evidence Was Insufficient ...................................... 20

    II.    Count 2(a) Should Be Vacated Because the Government Failed to Disclose Critical Expert Testimony, in Violation of Rule 16(a)(1)(G) ...................................................... 24

        A.    The Rule ................................................................ 24

        B.    The Violation .......................................................... 26

        C.    The Prejudice ......................................................... 32

CONCLUSION ...................................................................... 43

CERTIFICATE OF COMPLIANCE ............................................... 44

CERTIFICATE OF SERVICE ...................................................... 45

# TABLE OF CITATIONS

## CASES

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ................................................................ 40

*Kilpatrick v. Breg, Inc.*,
    613 F.3d 1329 (11th Cir. 2010) ............................................ 40

*United States v. Bell*,
    761 F.3d 900 (8th Cir. 2014) ................................................ 13

*United States v. Bixler*,
    2022 WL 247740 (6th Cir. 2022) .......................................... 14

*United States v. Chastain*,
    198 F.3d 1338 (11th Cir. 1999) ............................................ 36

*United States v. Dukagjini*,
    326 F.3d 45 (2d Cir. 2003) .................................................... 25

*United States v. Duvall*,
    272 F.3d 825 (7th Cir. 2001) ................................................ 32

*United States v. Hastamorir*,
    881 F.2d 1551 (11th Cir. 1989) .............................................. 7

*\*United States v. Hawkins*,
    934 F.3d 1251 (11th Cir. 2019) ...................................... 41, 42

*United States v. Lacy*,
    904 F.3d 889 (10th Cir. 2018) .............................................. 14

*United States v. Louis*,
    861 F.3d 1330 (11th Cir. 2017) ........................................ 7, 12

*United States v. Mack*,
    808 F.3d 1074 (6th Cir. 2015) .............................................. 14

iii

*United States v. McIntyre,*
    612 F. App'x 77 (3d Cir. 2015) ............................................................. 13

*United States v. McKinley,*
    647 F. App'x 957 (11th Cir. 2016) ....................................................... 13

*United States v. Noe,*
    821 F.2d 604 (11th Cir. 1987) .............................................................. 37

*United States v. Purcell,*
    967 F.3d 159 (2d Cir. 2020) ................................................................. 14

*United States v. Rhymes,*
    827 F. App'x 266 (4th Cir. 2020) .................................................... 13, 22

*United States v. Shine,*
    2022 WL 761520 (2d Cir. 2022) .......................................................... 14

*\*United States v. Smith,*
    719 F.3d 1120 (9th Cir. 2013) .............................................................. 15

*United States v. Weise,*
    606 F. App'x 981 (11th Cir. 2015) ....................................................... 14

*United States v. White,*
    492 F.3d 380 (6th Cir. 2007) ................................................................ 32

*United States v. Williams,*
    5 F.4th 1295 (11th Cir. 2021) .............................................................. 13

*United States v. Williams,*
    900 F.3d 486 (7th Cir. 2018) ................................................................ 32

iv

## STATUTES

18 U.S.C.

§ 2 ...................................................................................................3, 4

§ 1591(a)(1)............................................................................. 3, 4, 9, 12

§ 1591(b)(1).................................................................................. 3, 4, 9

§ 1591(b)(2).........................................................................................4

§ 1591(e)(2).......................................................................... 2, 10, 13, 23

§ 1591(e)(5)................................................................................ 11, 13, 23

§ 2421(a) ............................................................................................4

§ 3231 ...............................................................................................1

28 U.S.C. § 1291 ...................................................................................1

## RULES

Fed. R. Crim. P.

16, adv. cmte. note (1993)...............................................................25, 37

16(a)(1)(E) (1993) ...........................................................................25

16(a)(1)(G) ................................................................................ *passim*

29 ...............................................................................................23

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231 because the defendant was charged with offenses against the laws of the United States.  This Court has jurisdiction under 28 U.S.C. § 1291, which confers jurisdiction on the courts of appeals from final decisions of the district courts.  Mr. Walker timely filed a notice of appeal on January 13, 2022 (DE 142) from the original judgment of January 6, 2022 (DE 138), and a second notice of appeal on March 11, 2022 (DE 180) from the amended judgment of March 9, 2022 imposing restitution (DE 178).

## STATEMENT OF THE ISSUES

I.     As to Count 1, whether there was sufficient evidence of "coercion" within the meaning of 18 U.S.C. § 1591(e)(2).

II.    As to Count 2(a), whether the government violated Fed. R. Crim. P. 16(a)(1)(G) by failing to disclose before trial expert testimony that was critical to its theory of "coercion."

## STATEMENT OF THE CASE

### I.    COURSE OF PROCEEDINGS & DISPOSITION BELOW

Mr. Walker was charged in a superseding indictment with three (really three-and-a-half) discrete counts involving three alleged victims. The charges were all based on events occurring in Miami during the four-day period between January 24, 2020, and January 28, 2020.  (DE 46).

Count One charged Mr. Walker with sex trafficking an *adult* victim—namely, Juanita Barr (a/k/a J.B. or Nelle)—by means of force, threats of force, or coercion, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), and 2.  At trial, however, the government did not allege any use or threats of force—only coercion.  And that was the only disputed issue at trial. Under § 1591(b)(1), this count carried a mandatory minimum of 15 years.

Count Two charged Mr. Walker with sex trafficking a *minor* victim—namely A.H. (a/k/a Redd)—in two alternative ways.  First, as in Count One, it charged sex trafficking by means of force, threats of force, or coercion, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), and 2.  Again, however, the government did not allege any use or threats of force—only coercion.  And, again, that was the main disputed issue at trial.  Under § 1591(b)(1), this offense carried a mandatory minimum of 15 years.

3

Count Two alternatively charged Mr. Walker with sex trafficking of a minor under the age of 18, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), (c), and 2.  Under § 1591(b)(2), this offense carried a mandatory minimum of 10 years.  During closing argument, defense counsel conceded guilt on this offense.  However, he maintained that Mr. Walker was not guilty of sex trafficking a minor by coercion under § 1591(b)(1), which carried the 15-year mandatory minimum.  (DE 191:80–81).

Finally, Count Three charged Mr. Walker with transporting an adult victim—namely, Simone King (a/k/a S.K. or Nina)—with the intent for her to engage in prostitution, in violation of 18 U.S.C. § 2421(a).  This offense carried a maximum penalty of 10 years.  At closing argument, defense counsel conceded guilt on this count as well.  (DE 191:55, 81).

Following a seven-day trial, the jury found Mr. Walker guilty on all three counts, including both theories of liability for Count Two.  (DE 118).

At sentencing, the district court sustained several of Mr. Walker's guideline objections and arrived at an advisory guideline range at 292-365 months.  (DE 189:46).  Notwithstanding the government's request for a sentence of 600 months (*i.e.*, 50 years) (DE 130; DE 189:59, 61), the court sentenced Mr. Walker to 300 months (*i.e.*, 25 years).  (DE 189:65).

4

## II.    STATEMENT OF FACTS[1]

The government's main witness at trial was FBI Special Agent Alex Loff.  As the case agent, he testified for three days.  He testified as a fact witness, narrating numerous text messages among Mr. Walker and the victims.  And he also testified as an expert witness on both cellphone extraction and human trafficking.  On the latter subject, he gave critical expert testimony that pimps often use romantic/sexual relationships to lure women to engage in prostitution.  *See infra* Argument § II(B)–(C).

In addition to Special Agent Loff, the two adult victims—Juanita Barr and Simone King/Nina—testified at trial.   Neither the minor victim—Redd—nor Mr. Walker testified at trial, but the government played their post-arrest statements.   The officer who served as an undercover John involved in Mr. Walker's eventual arrest also testified.

The evidence generally revealed the following.  In January 2020—the time of the charged offenses—Mr. Walker was a 47-year old man living in Connecticut and working as a truck driver.  On the side, he was a small-time pimp.  Redd, a 17-year old runaway, became his "bottom."

---

[1]  For background purposes, this section recounts the general facts at trial.  The key facts and record citations bearing directly on the claims on appeal are recounted in detail in the respective argument sections below.

5

Mr. Walker took her in, and they entered a romantic/sexual relationship. As his "bottom," Redd engaged in prostitution activities for Mr. Walker, and she actively recruited other women to do the same. Mr. Walker and Redd soon wanted to grow their prostitution operation.

Under Rule 404(b), the government introduced evidence that, at the end of 2019, Mr. Walker, Redd, and Nina (one of Redd's adult recruits) had gone to Texas, in part to engage in prostitution activities. Although that trip was not particularly fruitful, in January 2020, Mr. Walker quit his truck-driving job in order to pimp more with Redd as his "bottom." That month, they decided to go to Miami during Super Bowl weekend, in part to vacation and in part to engage in prostitution activities. Redd recruited Juanita Barr, an adult who she knew from Connecticut, to join them. Redd recruited Nina to join them in Miami as well.

Mr. Walker drove all three women from Connecticut to Miami, and they stayed together at a hotel. After seeing the sights, and going to a strip club and a bar, the women "walked the blade"—*i.e.*, walked around looking for Johns—on Miami Beach but were not successful. Redd and Nina ultimately met two men who invited them on their yacht, and Juanita Barr decided to join them. Juanita and Nina went off alone with

6

one man.  But he was drunk and, without engaging in any sex acts, just gave them money, which Nina later gave to Redd.  Redd went off with the other man, but there was no evidence they engaged in any sex acts.

Because they were not having much success walking the blade, and were running low on money, Mr. Walker and Redd decided to post a prostitution ad online for Juanita Barr.  An undercover officer responded to the ad.  He came to the hotel for the date with Juanita, while Mr. Walker, Redd, and Nina waited in the car.  Once inside the room, Juanita began to undress, at which point numerous officers entered the room.  All four were arrested or detained and gave statements.

It was undisputed that Mr. Walker never used, or threatened to use, any physical force or violence with anyone, including the victims.

### III.  STANDARDS OF REVIEW

This Court "review[s] *de novo* a district court's denial of a motion for acquittal."  *United States v. Louis*, 861 F.3d 1330, 1333 (11th Cir. 2017).  This Court "review[s] cases dealing with discovery violations under Fed. R. Crim. P. 16 using an abuse of discretion standard."  *United States v. Hastamorir*, 881 F.2d 1551, 1559 (11th Cir. 1989).

7

## SUMMARY OF THE ARGUMENT

For Counts 1 and 2(a) in this case, the government proceeded under the sole theory that Mr. Walker knew that "coercion" would be used to get Juanita Barr (Count 1) and Redd (Count 2(a)) to commit prostitution.

As to Count 1, however, the evidence of "coercion" was legally insufficient. In essence, the government's theory was that Mr. Walker "coerced" Juanita Barr—an adult—to engage in prostitution by declining to pay her way home after she stopped having fun on a vacation and the group ran low on funds. No court has endorsed such a novel theory. And the record makes clear that Juanita Barr intended to engage in prostitution because she herself made the voluntary decision to do so.

As to Count 2(a), the evidence of "coercion" was razor thin. The government itself admitted that Redd was an eager and active participant in Mr. Walker's prostitution operation. To prove "coercion," then, it relied on expert testimony that pimps often use romantic relationships to get women to commit prostitution. But the government failed to disclose that key testimony or its bases before trial, in violation of Rule 16(a)(1)(G). And that non-disclosure prevented the defense from rebutting that key testimony via cross examination or its own expert.

8

## ARGUMENT AND CITATIONS TO AUTHORITY

The sex-trafficking offenses in Counts 1 and 2(a) were both prosecuted under a theory of "coercion," and they both carried a 15-year mandatory minimum penalty under 18 U.S.C. § 1591(b)(1). To understand the prosecution's theory of "coercion"—and, in turn, Mr. Walker's arguments on appeal—it is necessary to parse the statute.

Section 1591(a)(1) provides: "Whoever knowingly . . . in or affecting interstate of foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing, or . . . , in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, shall be punished in subsection (b)."

At trial, most of those elements were not in serious dispute. It was undisputed that Mr. Walker drove Juanita Barr and Redd to Miami from Connecticut. So there was no real dispute that, at the very least, he knowingly "transported" them in interstate commerce. Rather, the only dispute was whether he did so knowing or in reckless disregard of the

fact that "force, threats of force, fraud, [or] coercion" would be used to cause them to engage in a commercial sex act—*i.e.*, prostitution.

In that regard, the government did not charge "fraud" in the indictment, and so it expressly disavowed that theory at trial. (DE 187:231–32). The government also admitted at trial that there was no evidence of any "force" or "threats of force," and so it disavowed that theory as well. (DE 192:38, 55). As a result, the government proceeded exclusively under a theory of "coercion." And Mr. Walker's theory of defense at trial was that he did not use any "coercion." (DE 116:18–20).

The statute defines "coercion" to "mean[ ]—(A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2). At trial, there was no allegation or evidence of any "physical restraint" in (A) or (B). Nor was there any allegation or evidence of any abuse of law or legal process in (C).

Instead, the prosecution proceeded under the theory in (B) that Mr. Walker engaged in a "scheme, plan, or pattern intended to cause a

person to believe that failure to perform an act would result in serious harm" to them.  Critical to that definition is the term "serious harm." And that term is defined by statute as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm."  18 U.S.C. § 1591(e)(5).

As explained below, the evidence at trial was insufficient to prove "coercion"/"serious harm" in connection with Juanita Barr, the adult victim in Count 1.  So that conviction should be reversed.  With respect to Redd, the minor victim in Count 2(a), the government's case for "coercion" hinged on expert testimony that was not disclosed before trial, in violation of Rule 16(a)(1)(G).  So that conviction should be vacated.

## I.  Count 1 Should Be Reversed Because There Was Insufficient Evidence of "Coercion"

### A.  The Law

"When considering claims regarding sufficiency of the evidence, [this Court] view[s] the evidence in the light most favorable to the

government." *Louis*, 861 F.3d at 1333. "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, then a reasonable jury must necessarily entertain a reasonable doubt." *Id*. And this Court "must hold the government accountable to this burden." *Id*. at 1335. For "[w]hen a man's liberty is at stake, [the Court] must be vigilant with this burden" to "prove all elements of a crime beyond a reasonable doubt." *Id*. at 1331–32.

As to Count 1, the question here is whether, viewed in the light most favorable to the government, the evidence at trial established the element of "coercion" beyond a reasonable doubt. Using the language of the statute, the government had to prove that Mr. Walker transported Juanita Barr knowing that means of "coercion" would be used to cause her to engage in a commercial sex act. 18 U.S.C. § 1591(a)(1). And, to prove "coercion," it had to prove that he undertook a "scheme, plan, or pattern intended to cause [her] to believe that failure to perform" prostitution would result in harm to her that was "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person

12

of the same background and in the same circumstances to perform" prostitution "in order to avoid incurring that harm." §§ 1591(e)(2), (e)(5).

Most reported sex-trafficking cases involve (at least) some use or threatened use of violence—often brutal or vicious in nature—designed to completely control the victim-prostitute.[2] It is rare for a case to involve "coercion" alone, without any use or threat of force. And even in cases where "coercion" is a primary means of sex trafficking, the tactics are often egregious. In several cases, for example, the pimp developed or exploited a drug addiction and induced withdrawal symptoms, thereby

---

[2] *See, e.g.*, *United States v. Williams*, 5 F.4th 1295, 1303 (11th Cir. 2021) (describing violent beatings); *United States v. Rhymes*, 827 F. App'x 266, 269 (4th Cir. 2020) ("M.M. testified that she was under constant supervision and feared the consequences of trying to leave. M.M. also testified that she had nonconsensual vaginal and oral sex with Rhymes."); *United States v. McKinley*, 647 F. App'x 957, 961 (11th Cir. 2016) (unpublished) ("For example, after an escape attempt, McKinley 'hog-tied' her naked and beat her with a board."); *United States v. McIntyre*, 612 F. App'x 77, 79 (3d Cir. 2015) (victims "testified to being beaten by him or being present when he beat other women who worked for him. They further described being strictly controlled by McIntyre, even as to their purchases of necessities such as food") (footnote omitted); *United States v. Bell*, 761 F.3d 900, 908 (8th Cir. 2014) (victim "testified to several incidents where Bell physically assaulted her when she allegedly disobeyed or disrespected him. The physical harm was enough to cause her to perform sex acts against her will. . . . Bell also levied threats against the women by claiming that he would harm them or their families. He even threatened the women's young children.")

"coercing" the victim to engage in prostitution in order to avoid "serious harm." *See, e.g.*, *United States v. Shine*, 2022 WL 761520, at *2 (2d Cir. 2022); *United States v. Bixler*, 2022 WL 247740, at *7 (6th Cir. 2022); *United States v. Mack*, 808 F.3d 1074, 1081–82 (6th Cir. 2015).

In other cases, the pimp similarly created an environment where the victim had no real choice but to engage in prostitution. *See, e.g.*, *United States v. Purcell*, 967 F.3d 159, 193–94 (2d Cir. 2020) (describing how the pimp controlled all aspects of the victim's life and demanded that she "abide by an especially restrictive and menacing code of conduct," leading her to run "barefoot into the Pennsylvania winter on the first occasion on which Purcell had let her out of his sight, begging a stranger for help"); *United States v. Lacy*, 904 F.3d 889, 895 (10th Cir. 2018) (victim was "homeless and living out of her car," "all of her most important belongings were stored in the trunk," and the defendant "took her phone and car keys" and would not give them back unless she engaged in prostitution, which "made her feel like a child who had no say and no control over what happened to her"); *United States v. Weise*, 606 F. App'x 981, 984–85 (11th Cir. 2015) (unpublished) ("S.L. testified that after spending a night sleeping on the beach, she realized that she

14

'needed' Mr. Weise and 'didn't have anywhere else to go'; the defendant "deliberately avoided obtaining false identification for her, which would have given her more independence in finding work, so that she would remain dependent on him; and the defendant "broke S.L.'s jaw").  But where the defendant merely made the victim "dependent on him" by providing shelter, resources, a job, and a sexual relationship, courts have said that this does not rise to the level of "coercion."  *United States v. Smith*, 719 F.3d 1120, 1125 (9th Cir. 2013).  This is a far easier case.

## B.    The Facts

Viewed in the light most favorable to the government, the evidence of "coercion" as to Juanita Barr was as follows.  While in Connecticut, Juanita met Redd online, and they hung out socially at Redd and Mr. Walker's house.  (DE 187:61–67).  During one such occasion, Mr. Walker and Redd invited Juanita to have sex; she declined.  She never had sex with Mr. Walker because he wasn't her type.  (*Id*. at 67–68).

In January 2020, Redd invited Juanita to permanently move with her and Mr. Walker to Arizona.  Juanita agreed and told people she would be leaving Connecticut.  (*Id*. at 72–76, 86).  During that initial conversation, Redd told Juanita to pack "heels" and "hoe outfits" for the

15

move. (*Id*. at 75). Redd also said that the trip would be free and paid for; Juanita had no money of her own. (*Id*. at 91).

After they picked up Juanita, the plan changed. Mr. Walker and Redd explained that they would drop off some luggage in North Carolina, go to Miami for vacation, and then come back to Connecticut in order to retrieve the rest of their belongings. (*Id*. at 86). At that point, they would also drop off Juanita back home in Connecticut because she had changed her mind; she decided that she no longer wanted to move to Arizona with them. But as Mr. Walker and Redd still planned to vacation in Miami for a week, Juanita decided to go because she had never been to Miami before and was invited by her friend, Redd. (*Id*. at 87, 174).

On the first day in Miami, they all briefly went to a strip club and then left to go buy heels for dancing. (*Id*. at 94–96). But Juanita was "annoyed" and did not want to buy heels or dance, so she stayed in the car. (*Id*. at 95). Mr. Walker did not force her to go to the strip club (she went on her own) or buy heels (she stayed in the car). (*Id*. at 138–44).

At the end of the first full day in Miami, Mr. Walker and Redd mentioned staying in Miami for two weeks instead of one, which was "fine" with Juanita. (*Id*. at 97). "But then it went from two weeks to,

like, a month, to, like, maybe never leaving Miami." (*Id.*).  At that point, she wondered how she would get back to Connecticut.  (*Id.* at 97–98).  Mr. Walker suggested that she take a plane home.  (*Id.* at 98).  But Juanita did not want to fly because she was afraid of heights, which everyone knew.  (*Id.*).  Mr. Walker alternatively suggested that she take a train, which he said left once a month.  (*Id.*).  Juanita looked up the schedule on her own and discovered that the train left from Miami to Connecticut twice a day, and that a ticket cost $156.  (*Id.* at 98–99).  Because Juanita did not have money for the ticket, she thought she might ask Mr. Walker for it, or ask her sister to wire her the money.  (*Id.* at 99).

The next morning, the girls shared a few spoonfuls of yogurt for breakfast, and Juanita learned that the group was down to their last $50. (*Id.* at 100).  At that point, Juanita called her sister, explained that they were hungry and had little money, and asked her sister to wire money— but only $20 for a pizza.  Her sister wired the money.  (*Id.* at 100–01).

Mr. Walker suggested that the girls "walk the blade" to earn money for the hotel and food.  (*Id.* at 102).  But Juanita did not go; she said that she did not feel well, and she laid down in the car with Mr. Walker as Redd and Nina walked around.  At that point, Juanita was no longer

having any fun and wanted to go home. (*Id*. at 102–03, 111, 115–16). According to a Facebook post, she was "[t]ired of being here, not having my own money, still not making moves, still ain't smoke nothing. Like, a whole bunch of running around nonsense, no point to it. . . . [W]hen I do make money . . . I'm bouncing straight like that. [$]3,000 to 5,000 is my goal and I'm out. I feel trapped." (*Id*. at 147–48). She also posted that she had a "nice" time in Miami until the third day. (*Id*. at 174–75).

While in the car, Juanita asked Mr. Walker if she could go home, but he just ignored her and put his head down to sleep. (*Id*. at 103–04, 180). Redd then called Juanita and asked her to join Redd and Nina on a yacht with two men. (*Id*. at 104). Mr. Walker did not tell Juanita to join; rather, she decided to do so to make money for her train ticket. (*Id*. at 104–06, 135–36). Juanita understood that they would likely need to have sex with the men in order to make money. (*Id*. at 106). On the boat, however, Juanita did not engage in any sex acts; she and Nina went downstairs with one of the men, but he was very drunk and ultimately just gave Nina some money. (*Id*. at 109–10, 138). Nina later gave that money to Redd, which greatly upset Juanita because she had planned to use that money for her train ticket home. (*Id*. at 110, 116–17).

18

Because they were not making much money, Mr. Walker and Redd had the idea to post an online advertisement of Juanita using her phone. (*Id*. at 120–21). Mr. Walker and Redd told Juanita to respond to any inquiries, and Mr. Walker ultimately gave her condoms and instructed her on how to proceed on the date with the John. (*Id*. at 122–24). Juanita intended to have sex with the John to get money, and then go to the train station to buy a ticket home. (*Id*. at 125, 180). Juanita also considered that, if the John was an undercover cop (or even if not), he might be able to help her; but Juanita did not actually ask him for help. (*Id*. at 126). Once the John's phone rang and Juanita realized that he was indeed an undercover cop, she still did not ask her for help. (*Id*. at 127–28). The officer testified that at no time did Juanita ask him for help or appear fearful. (*Id*. at 47–52). Only after the hotel room was raided did Juanita ask the police to help her get home, and they purchased her a train ticket for the following day. (*Id*. at 129–31). Notably, Juanita also had a personal friend who was an FBI agent that she had known for 11 years. But she never contacted him while she was in Miami. (*Id*. at 171).

Juanita was, however, in "constant contact" with her family during her time in Miami. (*Id*. at 149). She spoke to her mother on January

19

24th, 25th, 26th, and 27th. (*Id*. at 148–49). And she communicated with her sister via telephone, FaceTime, text message, and Facebook. (*Id*. at 149). Although Juanita knew her mother and sister would financially support her however they could (*id*. at 148), and her sister had already wired her money, Juanita never asked them for money to get home. In one conversation, Juanita told her sister that she wanted to come home and that "[\$]156 is my ticket, which is nothing," but Juanita never asked for money or help. (*Id*. at 113, 116). Juanita otherwise made regular use of her cell phone during the trip, taking photographs and videos of the sights, including Super Bowl activity and food. (*Id*. at 112–14, 117–18).

## C.    The Evidence Was Insufficient

Viewed in the light most favorable to the government, no reasonable jury could find the element of "coercion" and "serious harm" beyond a reasonable doubt. To the contrary, Juanita Barr voluntarily decided to engage in prostitution in order to buy a train ticket home when she stopped having fun; she was not compelled by Mr. Walker to do so.

Indeed, everything that Juanita Barr did was of her own choosing. At no time did Mr. Walker use or threaten force against her; nor did she witness him to do so with others. (DE 187:134–35). In fact, he did not

force her to do anything at all. Before Miami, she declined his invitation for sex. She voluntarily went to Miami with Mr. Walker and Redd. In Miami, she voluntarily went to the strip club. She was allowed to remain in the car alone when everyone went into a store to buy heels for dancing. And she was allowed to remain in the car when Redd and Nina went to walk the blade. Ultimately, it was Juanita who made the decision to join the girls on the yacht; Mr. Walker did not tell her to do so. And while Mr. Walker or Redd posted an advertisement for Juanita, it was Juanita who decided to go forward with it; there is no evidence that Mr. Walker threatened or forced her to actually go on that date. Rather, she voluntarily did so in order to make money for a train ticket home.

Boiled down, then, the prosecution's theory was that Mr. Walker "coerced" Juanita by declining to pay her way home when their funds ran low and Juanita was no longer having fun on the trip. As a matter of law, that does not constitute "coercion." Indeed, counsel is unaware of any other reported case where "coercion" was based on a similar theory. As explained above, the vast majority of cases involve some use or threatened use of physical force or violence; there was none of that here. And in the few cases where "coercion" was the primary means of

trafficking, the facts were quite egregious. They were a far cry from running out of money on vacation and failing to pay for a ticket home.

The facts of this case are especially weak because Juanita Barr—an adult—had numerous options readily available to her that did not require her to engage in prostitution. She had unlimited use of her cell phone while in Miami, and she was left alone on numerous occasions. Yet at no time did she ask *anyone* for help. *Cf. Rhymes*, 827 F. App'x at 269 ("After realizing that she was alone in the motel room, M.M. ultimately was able to escape and report her experience to the police.").

Juanita talked to her mother every day on the trip, but never asked for help or money to get home. She also talked to her sister constantly, but never asked for help or money. That is so even though her sister had wired her money for food. Juanita even downplayed the $156 ticket to her sister. In short, Juanita revealingly never asked her family for help getting home. And there is no evidence that she researched other ways to get home (like a bus) or other ways to get money (like at a pawn shop).

Juanita also did not seek out any assistance from law enforcement. Despite the heavy police presence in Miami for the Super Bowl, there was no evidence that she ever asked an officer for help. Likewise, Juanita

failed to ask the John for assistance, even after discovering that he was an undercover officer. And although she was long-time personal friends with an FBI agent, she never even tried to contact him while in Miami.

Juanita never asked for help because Mr. Walker was not forcing her to do anything. Instead, she made the voluntary decision to engage in prostitution in order to pay her way home once she stopped having fun and the group's money ran low. That is not "coercion" within the meaning of § 1591(e)(2). Mr. Walker is unaware of any analogous case so holding. In short, no reasonable jury could have found that Mr. Walker "coerced" her to engage in prostitution to avoid "serious harm" under § 1591(e)(5).

Although the district court twice reserved on Mr. Walker's Rule 29 motions—calling the government's case "razor thin" and "flimsy"—it ultimately denied the motion after the jury returned its verdict. (DE 187:242; DE 191:104; DE 192:55). But that ruling was conclusory. So it now falls to this Court to hold the government accountable for failing to meet its burden of proving "coercion" beyond a reasonable doubt. Accordingly, the Court should reverse Count 1. Upholding the conviction would set a dangerous precedent by greatly expanding the scope of a federal criminal statute carrying a 15-year mandatory minimum penalty.

23

## II. Count 2(a) Should Be Vacated Because the Government Failed to Disclose Critical Expert Testimony, in Violation of Rule 16(a)(1)(G)

On Count 2(a), the evidence of "coercion" as to Redd, the minor victim, was very weak. Critical to the prosecution's case was expert testimony by FBI Special Agent Loff explaining how pimps often engage in romantic relationships in order to coerce women to engage in prostitution. But at no time did the government disclose that expert opinion or its basis, as required by Rule 16(a)(1)(G). And that failure prejudiced Mr. Walker's defense because the expert testimony was crucial to the government's theory of "coercion," Mr. Walker had no meaningful opportunity to rebut that expert testimony, and Loff (who was not even an expert at all) was both the main witness and lead agent.

### A. The Rule

At the defendant's request, the government must "give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 . . . during its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(G). "The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id*.

24

Added in 1993, and originally codified as Rule 16(a)(1)(E), Rule 16(a)(1)(G) "expand[ed] federal criminal discovery by requiring disclosure of the intent to rely on expert opinion testimony, what the testimony will consist of, and the bases of the testimony." Fed. R. Crim. P. 16, adv. cmte. note (1993). Such disclosure was "intended to minimize surprise that often results from unexpected expert testimony," "and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *Id*. These disclosure requirements also "create[d] an incentive for the government to limit its use of experts to proper subject matters of expert testimony, lest broader expert testimony require broader pre-trial disclosure." *United States v. Dukagjini*, 326 F.3d 45, 56 (2d Cir. 2003).

With respect to the "summary of the expected [expert] testimony," the Rule was "intended to permit more complete pretrial preparation." Fed. R. Crim. P. 16, adv. cmte. note (1993). In that regard, and "perhaps most important, the [defendant] is to be provided with a summary of the bases of the expert's opinion," whether or not the expert has prepared a formal report. *Id*. That summary "should cover . . . any information that might be recognized as a legitimate basis for an [expert] opinion." *Id*.

25

## B.    The Violation

In this case, the district court qualified Loff as an expert on human trafficking after Mr. Walker's voir dire and over his objection. (*See* DE 183:25–46). Loff then gave critical expert testimony at the trial. But the government violated Rule 16(a)(1)(G) by failing to "describe [Special Agent Loff's] opinions" or "the bases and reasons for those opinions."

1.    Shortly after being qualified as an expert on human trafficking, the government asked Loff to explain what a "bottom" is and how they often help the pimp recruit prostitutes, collect money, etc... (*Id.* at 49–50). The government then asked Loff how pimps were often able to "lure people into the world of prostitution," to which Loff responded: "We often see where they'll start or pretend to start a romantic relationship with the individual, and then before the girl, the victim notices, somehow she is engaging in sex other men for which she thinks is her boyfriend or husband or something like that." (*Id.* at 50–51).

Later on direct, Loff read several text messages, including one between Mr. Walker and Redd where he asked if she had posted out-calls. (DE 185:15). She responded: "That's all I do every day, all day, and

everyone asks for in-call." He replied: "Take some. We can't starve and die." (*Id*.). The following exchange then ensued:

> Prosecutor: All right. Now, you've talked a little bit about how based on your training and experience you've seen some pimps operate in developing these relationships with these women. How is it that they get them to sort of turn into prostituting themselves and engaging in these commercial sex acts?
>
> Loff: The ways I've often seen it, when it starts under the guise of a relationship, is that the pimp will build this future life goal with the victim; so they'll talk about all these plans that they have, these travels, this luxurious lifestyle, and it will slowly develop to, if we're going to achieve those goals, we need to make money; and the only way we can make that money is if you engage in these commercial sex acts.
>
> Prosecutor: Okay. And so some of these things that we've seen in some of these text messages we just went over, and this one here where we're saying, the text message is, "we can't starve and die," is that consistent with what you've seen based on your training and experience in other cases?

(*Id*. at 15–16). At that point, defense counsel objected as "invading the province of the jury." (*Id*. at 16). After the district court overruled that objection, Loff answered the prosecutor's question affirmatively. (*Id*.)

**2.** Here's the problem: the government failed to disclose those expert opinions or their bases before trial. That violated Rule 16(a)(1)(G).

The government's initial Notice of Expert Testimony was a bare two-page document. (DE 71). With respect to human trafficking—as opposed to cellphone extraction (Loff's true area of expertise)—the Notice disclosed only one actual expert opinion to which Loff would testify: "that the advertisements, methods, and terminology used by the Defendant and victims in this case is consistent with the engagement in commercial sex acts." (*Id.* at 2). Otherwise, the Notice recounted general topics about which Loff might testify: "the techniques, practices and methods used to advertise and manage persons who engage in commercial sex acts; and the terminology that human traffickers and persons who engage in commercial sex act use, including the use of code words and phrases while engaging in or recruiting for commercial sex acts." (*Id.* at 1–2). Nowhere in the Notice did the government disclose that Loff would provide expert opinions about how pimps coerce or lure women to engage in prostitution.

In response to the government's initial Notice, Mr. Walker filed a 20-page pleading objecting to Loff's proposed expert testimony. (DE 75). As relevant here, Mr. Walker argued that the government's Notice was

insufficient under Rule 16(a)(1)(G). (*Id.* at 4–6). He explained that there were two related problems. First, it was "impossible to determine what the government intends to actually have the agent testify to as an expert witness." (*Id.* at 4). Thus, the government's Notice was "insufficient with regard to what will be testified to by the expert." (*Id.* at 5). Among other unanswered questions that it raised: "What operations of commercial sex traffickers requires the use of an expert to interpret?" (*Id.*).

Second, Mr. Walker argued, the government's Notice was "also insufficient in providing the basis for the agent's expertise as well." (*Id.*). In other words, he asked, "what is the agent's opinion based upon? What data has the agent analyzed? What methods were used, and principles relied upon to generate the opinion and prove its reliability?" (*Id.*). Mr. Walker emphasized that he "should be provided specifics" in that regard, especially Loff's case-related experience on sex trafficking. (*Id.* at 5–6).

In that regard, he explained that Loff's "prior investigations and cases are hidden from the opposition." (*Id.* at 16). As a result, Mr. Walker had "no way of knowing prior cases the agent has been involved with; no way of knowing what the agent's actual role in those cases was; [and] no way of knowing whether there were critical differences in those cases."

(*Id*. at 16).  Without that information, Mr. Walker argued, he could not "possibl[y] challenge [an] agent's expertise because they are permitted to state that they have investigated 'x' number of cases and been to several trainings"—all without "explaining how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts" of this case.  (*Id*. at 16–17) (quotation and brackets omitted).

In response to Mr. Walker's demand for a "complete written summary of expert testimony," as well as the "basis and reason for each opinion" (*id*. at 6, 19), the district court entered two paperless orders. First, the court ordered the government to submit Loff's CV for in-camera review; the government had not even attached the CV to the initial Notice.  (DE 78).  Second, the court found that the government's Notice was "insufficient to satisfy its obligations under Fed. R. Crim. P. 16(a)(1)(G)."  (DE 79).  The court ordered the government to "file an amended notice containing a complete summary of Agent Loff's expert testimony that the Government intends to use in its case-in-chief, his opinions, the bases and reasons for those opinions, and a list of his qualifications."  (*Id*.).  But that ultimately did not happen.

In response to the court's order, the government filed an amended Notice of Expert Testimony. (DE 85). With respect to sex trafficking, the government again disclosed only that Loff would provide expert opinion about how the online advertisements in the case were consistent with prostitution. (*Id*. at 4–5). Critically, however, the Notice made no mention of expert opinions about how pimps coerce victims to engage in prostitution. The Notice also attached Loff's CV, which made no mention of his case work or experience on sex trafficking. And, with the exception of one vague training on "child abduction response," Loff's CV listed no training or certifications related to sex trafficking *at all*. (DE 85, Exh. 1).

**3.**    In light of the foregoing, there can be little doubt that the government violated Rule 16(a)(1)(G) by failing to disclose Loff's expert opinions—elicited by the government during its case-in-chief—about how pimps coerce victims to engage in prostitution. Indeed, despite Mr. Walker's extensive written objection to the initial Notice and the district court's order to comply with Rule 16(a)(1)(G), the government's amended Notice said nothing about that expert opinion or its basis at all. Instead, the government's amended Notice referred only to expert opinion about how online advertisements were consistent with prostitution, an issue

31

that was not even disputed.  The most the government could say is its initial Notice—which was later superseded—vaguely disclosed that Loff would testify about "techniques, practices and methods used to advertise and manage persons who engage in commercial sex acts." (DE 71:1).  But "Rule 16(a)(1)(G) requires a summary of the expected testimony" and its bases, "not a list of topics" or general subject matters to be covered. *United States v. Williams*, 900 F.3d 486, 489 (7th Cir. 2018) (Barrett, J.) (quoting *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001)); *accord United States v. White*, 492 F.3d 380, 407 (6th Cir. 2007).

## C.    The Prejudice

Loff's undisclosed expert testimony was critical to the government's case of "coercion."  The non-disclosure prevented the defense from rebutting that testimony.  And that testimony carried special weight.

**1.**    In closing, the prosecutor repeatedly referred to Loff's expert testimony when discussing the "coercion" of Redd.  (DE 191:40 ("At some point, we know she moves in with him.  We know from the messages that there's going to be talk about him being in love with her and then having a sexual relationship.  And you hear from Special Agent Loff about how some pimps use those relationships and romance to introduce girls and

32

women into the world of prostitution."); *id.* at 41 ("You heard from Special Agent Loff explaining how the pimps use romance and love and then the threat of withdrawal of that love to turn them into prostitution. And I submit to you that that shows and demonstrates that this defendant engaged in emotional manipulation that could leave to serious emotional psychological harm."); *id.* at 84–85 (making same "coercion" argument in rebuttal closing); *see also id.* at 40–41 (text messages "from defendant's phone where he states: I am the man, you are mine first, but you are also my wife, and you are going to teach others the game for me. Okay. And you heard testimony about what a 'bottom' or 'bottom bitch' is, and I submit to you that based on these conversations, when you really dig in and you read these conversations you're going to see that he was giving her [Redd] this position of power over the other women in his team").

The government heavily relied on Loff's expert testimony in closing because the evidence of "coercion" against Redd was otherwise meager. In fact, there was substantial evidence that Redd was an eager and complicit participant in Mr. Walker's prostitution enterprise. Indeed, Redd said so herself in her statement to the authorities, denying any "coercion." (DE 185:185–86 ("I'm not being forced. . . . And if I was

being—I don't—I'm not that type of girl. I'm not—I don't let nobody force me to do nothing. You don't know my momma. She raised me better than that. I ain't going to let nobody push me to do nothing. Everything that I do is by choice. That's why when that dude was touching up me at the foster home, I got up and fucking left because I don't play that shit.")).

Redd's actions were consistent with her statement. For example, while she was walking in Miami looking for Johns, Mr. Walker urged her to relax, take a break, and get some food. Redd stubbornly refused. She responded by expressing frustration about the lack of customers and saying that she would not take a break or eat until she made more money. (DE 185:204–06; DE 186:49–52). That was not the response of a person being "coerced." (*E.g.*, DE 186:50 (Redd: "I'm not trying to spend money until I make some, I'm fine."); *id*. at 52 ("[L]ike I said, it's fine. I will eat when I make money, I shouldn't have even hit you up."); *id*. (Mr. Walker: "the plan was to return, to rest, freshen up, and return. Now you are just being stubborn. . . . [L]et's go get you all some tacos and a shower.").

Redd was otherwise complicit and eager to help grow Mr. Walker's prostitution operation. Indeed, she told Mr. Walker that she "want[ed] to learn how to pimp." (DE 185:196). And she acted accordingly. She

34

actively recruited Juanita Barr (even though Redd was a minor and Juanita was an adult), and took an active role in recruiting other women. (DE 183:146–51; DE 185:197–98). It was Redd's idea for Juanita work in a strip club because she was an adult. (DE 185:201; DE 186:55). When Nina received money from the man on the yacht, that money went directly to Redd, who then complained to Mr. Walker about the amount. (DE 185:202–03; DE 186:58–59, 85; DE 187:110). She actively posted ads online for herself and others. (DE 185:185). And, tellingly, she continued to post ads online even *after* Mr. Walker was arrested. (DE 186:37, 68).

It was so clear that Redd was complicit in Mr. Walker's prostitution operation that the prosecution not only admitted that fact but tried to use that fact to its advantage. Although Count 2 described Redd as a "victim," the government nonetheless sought and received an aiding-and-abetting instruction. That allowed the government to argue in closing that Redd aided and abetted Mr. Walker's sex trafficking offense in Count 1. (DE 116:16; DE 191:16, 31, 46–47; DE 192:64–69, 121–22). In so arguing, the prosecutor acknowledged that, although Redd was charged "as a victim in this case, she can also be an active participant and an aider and abettor." (DE 191:31). In other words, the prosecution

itself admitted that Redd was "deeply involved in what this defendant is doing." (DE 191:84). That is how substantial the evidence was.

Although that fact is, at the very least, in tension with the idea that Redd was "coerced," the government then used it to further capitalize on another aspect of Loff's undisclosed expert testimony. In addition to testifying about the general responsibilities of "bottoms" like Redd (DE 183:49–50; DE 186:95–98), Loff specifically testified that, based on his "training and experience," pimps remain "responsible" for prostitution even where the "bottom" aids and abets. (DE 186:119). And while "bottoms" can be charged with the pimp, they are "frequently" victims who are not. (*Id*. at 125). The prosecution referenced that expert testimony in closing to support its theory of "coercion." (DE 191:40–41).

**2.**    Not only was Loff's undisclosed expert testimony critical to the government's theory of "coercion" on Count 2(a); Mr. Walker was also unable to mount a defense to that theory. *See United States v. Chastain*, 198 F.3d 1338, 1339 (11th Cir. 1999) ("In determining the proper remedy for the government's violation of discovery rules, the Court must consider how the violation affected the defendant's ability to present a defense.") (quotation omitted); *United States v. Noe*, 821 F.2d 604, 607 (11th Cir.

36

1987) ("[T]he purpose of Rule 16(a) is to protect the defendant's rights to a fair trial," and "the degree to which those rights suffer as a result of a discovery violation is determined not simply by weighing all the evidence introduced, but rather by considering how the violation affected the defendant's ability to present a defense."). That inability reflects the very purpose of Rule 16(a)(1)(G): "to minimize surprise that often results from unexpected expert testimony . . . and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16, adv. cmte. note (1993).

The government's theory of "coercion" was essentially that Mr. Walker entered into a romantic/sexual relationship with Redd in order to manipulate (*i.e.*, "coerce") her to engage in prostitution. (*E.g.*, DE 191:84–85 (rebuttal closing)). And that theory was based on Loff's (undisclosed) expert testimony that, in his "training and experience," pimps often use relationships to lure women into prostitution. (*Id.* at 40–41 (closing)). Mr. Walker was doubly unable to rebut that key testimony.

*First*, Mr. Walker could not (and so did not) cross-examine Loff on that key point. Loff's testimony was based exclusively on his "training and experience." But Loff never identified any prior case (or training) in

37

which he observed a similar "coercion" dynamic.  In the language of Rule 16(a)(1)(G), "the bases and reasons" for Loff's expert opinion were a mystery.  And that is precisely the problem that Mr. Walker identified in his pre-trial pleading.  Without knowing the cases or experience upon which Loff was relying, there was no way for him to cross-examine Loff. Had the bases/reasons been disclosed, Mr. Walker could have investigated Loff's prior cases and ascertained whether they in fact involved such a "coercive" dynamic, how many of his cases involved such a dynamic, whether they were in fact similar to the present case, etc...

As Mr. Walker told the court at the end of the trial: "There is an allegation in this case that there's a relationship and that the purpose of the relationship was to psychologically condition Redd.  But that's a really bare bones allegation about the psychological condition, because the evidence [ha]s really only come from" the fact that "there appears to be a relationship, but any other evidence is coming from the generic sex traffickers use this sometimes," and "there's no evidence from those other cases that they're saying this sometimes happens from to say, Well, that necessarily turns a prostitute into a bottom, or it necessarily makes them do the actions that Redd was doing in Miami."  (DE 192:46–47).

38

*Second*, had Loff's expert opinions been disclosed, Mr. Walker would have retained his own competing expert. The prosecution's theory of "coercion" turned on psychological expertise about how sexual or romantic relationships can be used to persuade or lure women to engage in acts of prostitution in order to avoid serious harm. But because the government failed to disclose that Loff would be opining on that issue, Mr. Walker had no notice that he would need to retain his own expert. That substantially impaired his defense. Rather than a battle of the experts, this trial was a one-sided affair—with no defense expert at all.

**3.**     There is more prejudice still from Loff's expert testimony.

*First*, Loff was not even a true expert on sex trafficking at all. Indeed, Loff twice admitted that he had *never* before been qualified as an expert in that field. (DE 183:40, 44). Aside from one training about "child abduction response," Loff's CV listed no trainings or certifications about sex trafficking. (DE 85, Exh. 1). And Loff had been a member of law enforcement for only three years. (DE 183:25). While he testified that he participated in several workshops and seminars about sex trafficking, none of those were listed on his CV. (*Id.* at 26, 41–42). Workshops and seminars were not the *true* basis for his supposed expertise. The true

basis was his case work and experience. But, again, those details were never revealed. And that experience involved serving as a lead agent in only 10 sex-trafficking cases and working on grand total of 20 to 30 such cases. (*Id*. at 27–28, 42–43). That limited experience was enough to make him a "human trafficking task force coordinator." (*Id*. at 28).

Ultimately, the district court qualified Loff as an expert in sex trafficking over Mr. Walker's objection, but the court failed to provide any reason for that ruling or make any factual findings. (*Id*. at 38, 43–45). That conclusory ruling—along with the district court's failure to conduct a *Daubert* hearing, as Mr. Walker had requested—represented an "abdicat[ion]" of the court's "gatekeeper role" with respect to this expert testimony. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336 (11th Cir. 2010); *see United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005) ("We have also found that a district court abuses its discretion where it fails to act as a gatekeeper by essentially abdicating its gatekeeping role.").

In addition to being reversible in its own right, that abdication exacerbated the prejudice to Mr. Walker from the government's Rule 16(a)(1)(G) violation, because Loff should have never been qualified as an sex-trafficking expert to begin with. Given his limited degree of training

40

and experience, he had never previously been qualified as an expert. Yet, in the end, his undisclosed "expert" opinion bearing on "coercion"—which Mr. Walker was unable to rebut via cross or his own expert—became the critical piece of evidence for the government with respect to Count 2(a).

*Second*, not only was Loff's "expert" testimony critical, but he was a critical government witness. Indeed, he was the government's first and main witness who testified for *three days* straight. And not only was he the government's main witness *and* an expert; he was also the case agent.

As this Court has recognized, there are special dangers where the case agent testifies about the facts of the case while also providing expert testimony based on his "training and experience." "The dangers presented by such 'dual testimony' include, among others: that it confers upon the agent an aura of special reliability and trustworthiness; that the agent could stray from applying reliable methodology and convey to the jury the witness's sweeping conclusions about appellants' activities; and that the jury could conflate the witness's expert and fact witness testimony." *United States v. Hawkins*, 934 F.3d 1251, 1266 (11th Cir. 2019) (quotations omitted). The upshot is that "such expert testimony may unfairly provide the government with an additional summation by

41

having the expert interpret the evidence, and may come dangerously close to invading the province of the jury." *Id*. (quotation omitted).

Here, Loff's "testimony placed the imprimatur of 'expertise' on his view of the facts of the case." *Id*.  Notably, Loff was asked to provide his opinion based on his "training and experience" no less than 75 times at trial.  And, as explained, his testimony on "coercion" "went to the crux of the Government's case, and the jury may well have afforded unusual authority to the agent, who was presented as having expertise, as well as knowledge beyond that available to the jury." *Hawkins*, 934 F.3d at 1266. That dynamic exacerbated the other forms of prejudice described above.

\* \* \*

In sum, the government violated Rule 16(a)(1)(G) by failing to disclose Agent Loff's expert opinions or their underlying bases.  That failure substantially prejudiced Mr. Walker's defense because: Loff's expert opinions were critical to the government's theory of "coercion" for Count 2(a); Mr. Walker was unable to rebut that theory either by cross examining Loff or by retaining his own expert; and Loff—who was not even a true expert on sex trafficking—was the prosecution's main witness and case agent whose testimony carried special weight with the jury.

42

## CONCLUSION

For the foregoing reasons, Mr. Walker respectfully requests that the Court reverse his sex-trafficking conviction in Count 1, and vacate his sex-trafficking conviction in Count 2(a) and remand for a new trial.

Respectfully submitted,

MICHAEL CARUSO
  FEDERAL PUBLIC DEFENDER

*/s/ Andrew L. Adler*
ANDREW L. ADLER
  ASS'T FEDERAL PUBLIC DEFENDER
  Attorneys for Appellant
  1 E. Broward Blvd., Suite 1100
  Ft. Lauderdale, FL 33301
  (954) 356-7436

43

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 9,214 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in New Century Schoolbook 14-point font.

*/s/ Andrew L. Adler*

44

**CERTIFICATE OF SERVICE**

I certify that on this 19th day of August 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and it is being served this day via CM/ECF on Lisa Tobin Rubio, Assistant U.S. Attorney, 99 N.E. 4th Street, Suite 523, Miami, FL 33132.

*/s/ Andrew L. Adler*