[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-10164

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

EDWARD WALKER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cr-20087-AHS-1

_____

———————————————

No. 22-10782

———————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

EDWARD WALKER,

Defendant-Appellant.

———————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cr-20087-AHS-1

———————————————

Before WILLIAM PRYOR, Chief Judge, and LUCK and HULL, Circuit Judges.

HULL, Circuit Judge:

Defendant Edward Walker, a pimp, transported three young women from Connecticut to Miami, Florida for his prostitution business shortly before Super Bowl LIV. Following a jury trial, Walker was convicted of three sex-trafficking-related

crimes: (1) sex trafficking of an adult (Juanita Barr) by coercion (Count 1); (2) sex trafficking of a person (A.H.) who is a minor and alternatively of a person (A.H.) by coercion (Count 2); and (3) transporting a person (Simone King) to engage in sexual activity (Count 3). In a special verdict form as to A.H., the jury found Walker guilty on Count 2 on both of the alternative liability theories: minor status and coercion.

On appeal, Walker challenges his convictions on Counts 1 and 2, but not on Count 3. As to Barr in Count 1, Walker argues there was insufficient evidence for the jury to find that he coerced Barr into engaging in prostitution. As to A.H. in Count 2, Walker does not challenge his conviction on the minor status theory. Rather, Walker asserts that the government's failure to disclose properly expert testimony—about how pimps use romantic relationships to coerce women to prostitute—requires that his Count 2 conviction on the coercion theory as to A.H. be vacated.

After review, and with the benefit of oral argument, we conclude (1) there was ample evidence to support Walker's coercion conviction in Count 1, and (2) as to Count 2, Walker did not challenge the government's amended notice of its expert testimony in the district court, plain error review thus applies, and Walker has not shown any alleged error in the notice prejudiced him on the coercion conviction. We thus affirm Walker's challenged convictions.

# I. FACTUAL BACKGROUND

The following facts are based on witness testimony and the exhibits admitted during Walker's October 2021 jury trial.

## A.    Pimping and Prostitution Generally

As background to the testimony of several witnesses, Federal Bureau of Investigations ("FBI") Special Agent Alex Loff explained pimping and prostitution generally.

A "date" is a commercial sex act. There are typically two ways prostitutes find customers for dates: (1) posting online advertisements and (2) walking the street or "blade," which is another word for "the street that girls typically walk up and down to solicit commercial sex acts."

"A pimp is a [sex] trafficker who is more or less the leader of the group." Pimps "are responsible for directing . . . things like how to engage customers, how to speak with them, [and] all the various activities of the girls in order to make money."

Usually, a pimp will recruit prostitutes by finding them on different online platforms, such as MeetMe, Facebook, or Instagram. The pimp will either (1) transparently state he is a pimp and ask the individual to work for him or (2) use deception, such as "pretend[ing] to have a romantic interest in" the girl.

If the pimp uses the guise of a romantic relationship, generally

the pimp will build this future life goal with the victim[,] so they'll talk about all these plans that they

have, these travels, this luxurious lifestyle, and it will slowly develop [in]to, if we're going to achieve those goals, we need to make money; and the only way we can make that money is if [the victim] engage[s] in these commercial sex acts.

If a pimp has more than one prostitute under his control, he will have a "bottom," which is short for "bottom bitch." The bottom is the individual who is responsible for (1) organizing the other prostitutes, (2) recruiting new women to join the pimp's group of prostitutes, (3) collecting money and posting advertisements for the prostitutes, and (4) doing whatever else the pimp delegates. In other words, the bottom is a pimp's "main girl that makes the money" and tells other women what to do. A bottom can be charged criminally along with the pimp in sex trafficking cases, but a bottom also can be a victim of sex trafficking. We now turn to Walker and his three victims.

**B.    Walker and Victim A.H.**

Defendant Walker lived in Connecticut and worked as a truck driver. In 2018, Walker, at age 44 or 45, met A.H., a 15-year-old runaway, "out in society" by the roadside at "a really weird location [in] East Hartford." A.H. is the minor victim in Count 2.

Walker seduced A.H. into a romantic and sexual relationship, moved her into his house, and began to hire her out for prostitution. On Walker's phone, both the lock screen and the home screen had a photo of him and A.H. Walker's contact name for A.H. in his phone was "Wife at home."

Prior to their Miami trip, Walker and A.H. advertised A.H. on prostitution websites and hired her out for $160 for a half hour, of which Walker took at least half. The record is replete with instances—especially text messages—of Walker manipulating A.H. to engage in commercial sex acts in order to meet his and A.H.'s material needs. For example, in October 2019, Walker texted A.H., "Baby did you try posting out calls? It is friday?!" An out-call is when the prostitute goes to the customer's residence.

A.H. replied, "That's all I do everyday all day and everyone asks for incall." An in-call is when the customer comes to the prostitute's residence. Walker answered, "Take some. We cant starve and die."

A.H. was also Walker's bottom and actively recruited other women to join Walker's small prostitution ring. For example, in October 2019, A.H. texted Walker, "Think I found a p101 ready at the store." This text indicated A.H. found "a person who [was] ready for an intro[duction] into pimping," meaning "a girl who would be directed to work and engage in commercial sex acts by a pimp." Walker texted A.H., "Your [sic] my wife, who teaches others our game."[1]

## C.    Victim Simone King

Simone King is the victim in the Count 3 conviction that Walker does not challenge on appeal. However, the recruitment and prostitution of King is interwoven with that of A.H. and Barr.

---

[1] "Game" refers to "the lifestyle of pimping."

Around May 2019, Walker recruited King (age 18) on MeetMe. Walker asked King if she wanted to meet and get "[s]ituated," to which she replied she was open to meeting, provided there was no sex involved. Walker responded, "Oh wait that's what escorting is about, my bad, I thought you understood. Pardon me, have a great day, and [a] great summer."

King said, "I'm fine with it. It's just I was asking because I didn't know escort was also prostitute." Walker replied, "We are a family style unit, no disrespecting or demeaning, you know?!" Walker also mentioned A.H., calling her his "girl." Walker told King that A.H. would be reaching out to her.

Walker and A.H. groomed King to work for Walker. When A.H. texted King, A.H. confirmed that (1) Walker was her "man" and (2) the women who worked for him "service[d] men for money." King asked a few questions, such as whether the work was hard, how much money they make, and whether the men were clean. A.H. explained, "It can range from $400-800 a day, depending on how motivated you are. And we use condoms. Nothing we offer is unprotected." A.H. also said that they "live[d] a lavish lifestyle."

Eventually, King moved in with Walker and A.H. in their house. Walker and A.H. taught King all about prostitution, and King began to "service men for money." Walker and A.H. set the prices for King's sex work. King gave all her earnings from her sex work to Walker and A.H. "[b]ecause [she] was living there, and [she] felt like . . . [she] had to chip in all the way."

Because King had no car and no driver's license, King would either take an Uber or have Walker or A.H. drive her to her out-calls. Walker ensured A.H. and King had condoms for their dates. For example, in September 2019, A.H. told Walker that King's date had arrived, and Walker asked, "You guys are str8 with condoms for this date correct?!" Walker also instructed King not to talk to the police if they were ever arrested to ensure they "didn't get in trouble."

While King lived with Walker and A.H., King slept in a separate room. At one point, though, Walker suggested that he join King and A.H., who were sleeping in King's room, but A.H. said no. Walker told King, "[A.H.] is weird sometimes let me Daddy this," which King understood to mean that he would "take care of it."

At another point, A.H. complained to Walker that King would "smile and giggle at her phone" when Walker would text her. Walker responded, "I'm so disappointed, I really believed the hype[.] This certainly will go no further if I cant talk to, direct[,] and preside over the [girls]. I cant pimp thru you." Similarly, when A.H. complained about King, Walker told A.H., "Your feelings wont have me broke, looking foolish and like a suckah. . . . I cant pimp according to your feelings[,] love."

King believed Walker and A.H. were in a "boyfriend and girlfriend relationship." King overheard noises coming from Walker's bedroom consistent with him having sex with A.H., but Walker also repeatedly had sex with King.

While Walker had sex with both A.H. and King, he would also withhold sex if he believed they had not made enough money for him.  For example, one day, Walker texted King, "Gmorning, I just woke up, I want You . . . and [A.H.], but none of yall made money! How this is gonna work is.  NO ONE, gets any unless we stacking."   King testified that this text message meant Walker would not sleep with them "at all" unless they were making money.

Walker encouraged King to "obtain some new hoes to increase [their] payroll."  For example, Walker texted King, "[Y]ou must remember, I own the lick her store, if you hand them over[,] I can put this double dose of P in their lives and wrap them up."[2]  Walker continued, "[L]eadership is mine and that will demand a prospects respect and loyalty."

Additionally, Walker texted King that prospects have "Daddy issues that cant be addressed by females," and there is "[n]othing more alluring then [sic] telling a bitch about your Daddy, and how she gone benefit.  That blows a bitches [sic] mind."  Walker added, "This is the spirit of the game, working through yall, showing charity to a bitch who may benefit from my game and be a blessing to our family."

To that end, Walker taught King about his recruiting preferences.  Walker explained that he "prefer[red] fresh turnouts" because even though they are "[m]ore work," they have "no bad

---

[2] "P" means pimp.

habits and such from lame ass dudes disguised as the pimp[].″ Walker also said:

> The problem is a bigger girl isnt really great outdoors, it′s a specific crowd that likes them . . . . I wont spend our hard earned on a[n] unproven prospect. Clothing or travel wise. Not saying she isnt sporting and up to muster, but we dont need a mouth to feed that cant put it out on the road.

**D.    Walker's Social Media Presence**

Walker regularly posted about pimping on his social media. For example, Walker shared memes on Instagram that said the following: (1) "Getting Pussy From Her For The First Time Don't Mean Shit … Getting Her To Sell It Is When You Actually Did Something!"; (2) "HOTEL CLERKS BE LIKE OH YOU ABOUT TO SELL SOME PUSSY HUH"; (3) "You told her on your life you only fuck bitches who pay you. let′s go PimPin"; (4) "As a pimp you should break your bitch every morning for everything. An[d] give her a new daily goal to reach for as your issue"[3]; (5) "Idgaf how pretty you are Bitch I d[o]n't like squares That play I like hoes that pay"[4]; (6) "Whatever a P is desiring from his Hoe he must first deposit into her. He cannot expect to get from her that which is not put into her already. If you want [money] from her, you must

---

[3] "Breaking" is when a pimp "get[s] a girl into [his] crew and ha[s] her perform commercial sex acts under [his] direction."

[4] A "square" is "anyone not involved in the life of pimping."

first deposit [game] into her"; and (7) "stretch Her mind to a new reality of possibility and potential, it will be impossible for Her to return to Her previous dimension or circumstance #KHM #HGO cause #PGO #comeFWM304 #Blessing2DGame."[5]

### E.    Houston, Texas

In December 2019, Walker, A.H., and King traveled to Houston, Texas.  Around the time of this trip, Walker performed an Internet search for "how many years for a human trafficking charge."

When they arrived in Houston, Walker sent an Instagram message that said, "Without doubt, I think [A.H.] just bumped her 1st white bitch and we didn't even leave the airport."  This message meant A.H. had "ma[d]e contact with someone and attempt[ed] to recruit them."

While in Houston, Walker, A.H., and King went sight-seeing during the day, but at night, King and A.H. "walk[ed] the blade" to make money for Walker by engaging in commercial sex acts.

This trip was part of a broader "plan," where Walker, A.H., and King were supposed to travel across the country to make money from prostitution.  When Walker, A.H., and King got back to Connecticut after their Houston trip, they decided their next stop for making prostitution money would be Miami, Florida.

---

[5] "HGO" means "[h]oe-ing [g]oing [o]n," "PGO" means "pimping going on," and "304" means "ho[e]"—i.e., a "girl working under the direction of the pimp."

**F.    Grooming of Victim Juanita Barr and Inviting Barr to Miami in 2020**

Juanita Barr is the victim in Count 1.  At some point before May 2019, A.H. met Barr on MeetMe.  Barr used MeetMe "[t]o try to make friends" because she did not have many friends in her area. Meanwhile, A.H. used MeetMe to meet and groom girls—like King and Barr—for Walker.

Barr was born and raised in Connecticut.  When she was growing up, Barr lived with her mother and six siblings in Section 8 housing, and "money was tight."  Barr had family support "[f]or the most part," meaning she did not "really ask for much, but if [she] need[ed] help, [her] mom or [her] sister would help [her]." Barr did not finish high school but tried to get her credits for high school through adult learning classes.

The day that A.H. and Barr met on MeetMe, Walker and A.H. picked Barr up and drove her to their house in Bridgeport, Connecticut.  Walker went to work, while A.H. and Barr "sat on the couch and . . . got to know each other."  A.H. told Barr that Walker was "her man" and that "she didn't work, that she just hangs out and that's it."

After that first meeting, A.H. and Barr hung out "every other two or three days" at Walker's house.  When A.H. and Barr hung out, Walker was "[u]sually[] at work," but if Walker was around, he would "[b]riefly" speak to Barr.  Eventually, Walker and A.H. moved to New Haven, Connecticut, and Barr visited their New

Haven house "once every two months or once a month." Sometimes, Barr would stay overnight during these visits.

Barr never started a relationship with Walker and never had sex with Walker because he was "not [her] type," as she "prefer[red] females over men." At one point, though, Walker and A.H., as part of the grooming, asked Barr to "have sex with one of them," but Barr declined.

On January 15, 2020, A.H. texted Barr, "[S]o you basically moving with us. We gonna get a house in Arizona when we done hitting all the big cities." Barr understood this text to mean that Walker and A.H. were going to Miami for a trip and then moving to Arizona, and Barr was invited to go with them. Barr initially agreed to go with them.

That same day, A.H. texted Walker that she got Barr "on board" for the Miami prostitution trip. Walker asked, "She coming for the whole trip or just Miami?!" A.H. replied, "She's coming for the whole trip + the rest of her life."

Walker praised A.H. for being "a positive witch, casting spells and such." A.H. replied, "Its that IZM," which is "knowledge of the game or knowledge of pimping." Walker agreed with A.H., writing, "Indeed great game love."

Later, Barr learned that Walker and A.H. were actually planning to do "a lot of other moving around" to other cities, and they were not going straight from Miami to Arizona. Barr "didn't want to travel," "had a lot going on for [her]self like school," and

her "sister's birthday was coming up in February," so Barr "didn't want to go anymore."

The plan then became that Walker, A.H., and King would (1) go to Miami "to celebrate" for a week, (2) backtrack to North Carolina to "drop off some luggage and stuff," and (3) return to Connecticut to "pick up their other stuff" before going to Arizona. Because they were going to stay in Miami for only a week and could drop Barr off in Connecticut afterwards, Barr ultimately agreed to go on the Miami trip.

Barr later told a friend via Facebook that she went to Miami because she had "never been to [M]iami b[efore], and [she] wanted to go for [a] first vacation."

### G.    Pre-Miami Preparations

To get ready for his money-making prostitution business in Miami, Walker quit his job as a truck driver to pimp full time. In addition, Walker, A.H., and King packed up their house and returned the keys to the landlord.

Before the Miami trip, Barr told A.H. that she "didn't have any money." As part of her grooming of Barr, A.H. replied that all of Barr's expenses, such as food, drinks, and hotel, "would be taken care of" while they were in Miami. So Barr "assumed [the trip] would be paid for" and "thought they had a lot of money."

A.H. also told Barr that "[w]e got family down there" who own three strip clubs that they were "[a]bout [to] get into" and instructed Barr to pack heels and "hoe outfits." Barr testified that

she understood A.H. to be telling her to bring "really cute outfits" and that A.H. was "going to be dancing somewhere." But Barr was "sure . . . they ha[d] other jobs that [she] c[ould] participate in while [A.H.] danced." Barr testified that she "would have never imagined that . . . anyone expected [her] to have sex with anyone" on the Miami trip.

Meanwhile, Walker prepared for all three women—A.H., King, and Barr—to do sex work for him in Miami. In an Instagram message to his niece, who lived in Fort Lauderdale, Florida, Walker said, "[M]e and my team will be in . . . ur town for the superbag at the superbowl, can we get a couple auditions at your folx place(s)"? In a January 16, 2020, text message to King, Walker said, "I trust you stayed up with [Barr] and chopped it up, she is good people, she will be better away from CT [and] the best when she realizes she can do very well with Our program."

Walker reminded King of their roles via text: "You coming at me like I owe you love, that's not the case[.] Even when you speak like that to me, I am carrying you . . . , let's not forget our roles[,] our lanes[,] and who we are." And Walker warned King that "we just arent tolerating anything less than 100% participation" and instructed King to "change the attitude[,] get the phuck in gear[,] and get the phuck involved[,] or [she] w[ould] have to stay" in Connecticut.

## H.    Driving to Miami on January 23–24, 2020

On January 23, 2020, Walker drove A.H., King, and Barr from Connecticut, where they all lived at the time, to Florida. At

the time of this trip, Walker was 46, A.H. was 17, King was 18, and Barr was 23.

Barr was not close to her fellow travelers.  Barr did not know King "very well," as they had "talked, like, two days . . . before leaving [on] the trip."  Before A.H. invited Barr to Miami, Barr had an on-again, off-again friendship with A.H. and had not spoken to A.H. for three or four months.

On the drive down to Miami, Walker, A.H., King, and Barr spent a night in Daytona, Florida.  Once in the Miami area, they checked into one room together at a Comfort Inn & Suites in Kendall at 6:46 p.m. on January 24, 2020.

## I.    Indefinite Stay in Miami

Upon arrival in Miami, Barr quickly became disillusioned and learned the reality of the trip.  In their room at the Comfort Inn, Barr overheard the group discussing the plan for Miami, which quickly became two weeks, then a month, and then an indefinite stay in Miami.  Barr testified that the news was "overwhelming" because it upended her plans to return to Connecticut.  Barr had belongings in Connecticut, she had planned to be back in time to celebrate her sister's birthday, and she was not having fun because she was "constantly playing referee" during arguments between A.H. and King.

Upon learning that this was not a short trip, Barr wanted to go home, but she had no money.  Barr asked Walker how she would get back home, and Walker replied that she should take an airplane. Barr told Walker that an airplane was "out of the question" because

she is "terrified of heights." Walker then said that she could take a train but that the trains depart from Miami to Connecticut only once per month.

Barr later found out by searching online that trains leave for Connecticut twice daily. But the ticket price for a train from Miami to Connecticut was $156, which Barr did not have. Barr "thought maybe they would . . . give [her] the money" or she "would probably try to ask [her] sister if she had the money."

During the trip, Barr texted, FaceTimed, and called her sister several times and spoke with her mother every day. At 12:32 a.m. on January 25, Barr's sister messaged her on Facebook, asking when she was coming back to Connecticut.[6] Barr replied, "I already know how to take the train [$]156 is my ticket which is nothing."

**J.    Low on Funds**

However, other Walker surprises awaited Barr. After waking up and showering later that morning, Barr learned that the group had only $50 left. This was also not the all-expenses-paid trip Barr thought she was taking. Because they did not have any money, Walker instructed the women to share "a tub of yogurt" and controlled how many "spoonfuls" of yogurt the women were allowed to have for breakfast.

---

[6] The time stamps for all messages are in Universal Time Coordinated. For ease of reference, we have converted the times to Eastern Standard Time.

With no money for even food, Barr had to call her sister to ask for money so that she could buy a pizza to share with A.H. and King. Barr's sister sent $20 via CashApp. Barr did not tell her sister what was going on, but her sister "put two and two together" and "kind of figured [it] out."

**K.    Strip Club on January 25**

At 12:49 p.m. still on January 25, A.H. texted Walker, "Just an idea. You should take [Barr] to work the club and me and [King] will do everything else. She is over 21 there's possibilities and opportunities for her." Walker responded, "Great idea[,] we arrived at the same conclusion at the same time, you know, great minds think a like [sic]."

Around 3:40 p.m. on January 25, Walker took A.H., Barr, and King to a strip club. They stayed at the strip club only briefly because A.H. and King did not have identification.

After leaving the strip club, Walker, A.H., and King went to a store to buy heels. Barr "was a little aggravated and annoyed" because she "didn't want to get heels" and "didn't want to dance" at a strip club. So Barr stayed in the car while the others went into the store.

**L.    Ocean Drive in Miami on January 25**

Later on January 25, Walker directed the women—A.H., King, and Barr—to walk around Ocean Drive and "talk to some guys" to gather funds for food and lodging. More specifically, Walker instructed the women "to walk around and see if

somebody would . . . buy [them] some food and drinks, and then maybe afterward, they would want to probably hang out."

Barr testified that, at this point in the trip, she was "[t]rying to find a way to get home" because she was hungry, stranded, and "no longer having any fun." So Barr walked the blade with A.H. and King to try to make money to go home.

Eventually, the Miami heat took a toll on Barr. Barr told A.H. and King that she was not feeling well, so she went to lie down in the car. Only Walker and Barr were in the car. Barr again told Walker that she wanted to go home, but to no avail. Walker "didn't say anything"; instead, "[h]e just looked at [Barr] and then turned back around and put his hat down and crossed his arms . . . [like he] was going to sleep or something."

## M.    Yacht on January 25

At 6:18 p.m. still on January 25, A.H. texted Walker: "We got offered to go somewhere for free so we gonna go." A.H. called Barr to tell her that two men had offered to buy them food and that Barr should join them. A.H. also told Barr that the men had offered to pay the women to join them on their yacht, which Barr understood to mean payment for sexual favors. Specifically, Barr testified that she thought the women "were going to have to at least sleep with the[] [men] to try to make the money" because she was "a hundred percent sure that they wasn't just going to give [the women] the money just if [they] asked for it."

Once again, Barr felt compelled to go in hopes of collecting the $156 for a train ticket home. So, at 7:20 p.m. on January 25,

Barr texted A.H., "Where u guys at i was gonna walk to u."  Barr added, "Sorry wasnt feeling well felt nausea [sic]."  Barr met up with A.H. and King on a street corner, and they left in a car with the two men—Yachty Lou and Miami Tom.

At 8:35 p.m. on January 25, A.H. texted Walker: "We all with 2 dudes gonna go on the[ir] boat for an hour and make money." When Barr boarded the yacht, she was suspicious of Yachty Lou and Miami Tom, going so far as to throw out the wine that they had poured for the women out of fear of being drugged.  A.H. followed Miami Tom into one of the downstairs rooms.  Barr and King went into another room with Yachty Lou.

King told Yachty Lou that she could not have sex with him because she was menstruating.  Looking at Barr, Yachty Lou said, "Well, I'm looking for more than just, you know, a dance; so one of you guys gotta do something."  Barr and King began to "dance naked" for Yachty Lou, "but then he couldn't do anything [sexually] because he was drunk and he was nervous."  Yachty Lou nonetheless paid them.

King gave the money to A.H., which thwarted Barr's efforts to get home to Connecticut.  Barr was "very disappointed" that King handed over the money because Barr and King talked beforehand about their plan to use "the money to take a taxi and take a train together back home to Connecticut."  Barr did not ask A.H. for the money though "because [she] kn[e]w that she wouldn't have gave it back to [her]."

At 11:16 p.m. still on January 25, A.H. texted Walker that they were on the way to the hotel. A.H. added that they "only made $700 but that's awesome for [their] first break luck."

At 12:38 a.m. on January 26, Barr messaged her sister on Facebook, saying that she was "ready to go the fuck home." A few minutes later at 12:43 a.m., A.H. texted Walker that they were "[a]lmost there."

Later that January 26th afternoon at 2:17 p.m., Barr messaged her sister on Facebook that "[y]o ho[m]e girl wa[s] gonna get beat up." This message meant that Barr "was really upset at [King]" for giving the money from the yacht date to A.H. because King "kn[e]w [Barr] was going to use the money to go home." Basically, Barr "felt like [King] played [her]." Barr was thus still stuck in Miami with Walker and his women.

## N.    Sex Advertisement for Barr's Services

Low on funds again, Walker and A.H. decided to post advertisements for the women to engage in commercial sex acts "because [the women] weren't making any money" and the group had only one more night paid at the hotel. Walker and A.H. "came up with the idea" to advertise Barr online.

Taking Barr's cellphone, Walker and A.H. posted an advertisement for Barr on skipthegames.com.[7] The advertisement

---

[7] Skipthegames.com is an "adult posting website where people can put their advertisement out there to engage in sexual encounters for the exchange of money."

promoted "foxxy," who was "new in th[e] area [and] looking for a great night." The advertisement listed Barr's phone number. Barr did not write any of the advertisement. When Barr got her cellphone back, Barr learned of the advertisement, and Walker told her to answer her cellphone "[i]f men called for a date."

**O.    Barr's January 27th Date that Led to Walker's Arrest**

On January 27, Barr received a text message from a customer asking if she was available for a date that evening, but she ignored it at first. Both Walker and A.H. asked if she had gotten any texts from customers and ordered her to show them her cellphone. Walker ordered Barr to text or call the customer back. Barr called the customer, and they agreed to meet at Walker's hotel room at the Comfort Inn for a one-hour date in exchange for $300.

Barr had never had sex with men for money. Walker knew Barr had no money and effectively stranded her indefinitely in Miami. Barr agreed to meet the customer and do it so that she could get money and leave Miami. After the customer paid her, Barr planned to take a taxi to the train station or ask the customer to take her to the train station. Barr felt like she had to do it because she had no money and "when [she] tried to ask [Walker] if [she] c[ould] go home," she was ignored. Barr felt like sex work was "literally . . . the only way" to get home because she had no other way to earn money.

Walker drove Barr, A.H., and King to the Comfort Inn. Once there, Barr went inside with her cellphone and condoms—

which Walker gave to her—to have her date, while Walker, A.H., and King waited in the car.

Right before meeting the customer, Barr got nervous but told herself that if the customer ended up being a cop, she would ask him for help and if the customer was not a cop, she would get her money and leave.

Once Barr let the customer into the hotel room, Barr talked to him and offered him a massage. Barr did not immediately tell him that she was trapped in Miami because she feared he would not care or, worse, would turn aggressive toward her. The customer gave Barr $300, and then they talked for a little bit. Eventually, Barr took off her shirt. The customer's cellphone rang, so he went into the bathroom, claiming that his wife was calling.

Barr testified that, "at this point," she knew "he [wa]s a cop." Barr was right. This operation was part of a human trafficking task force in Miami that was focused on the upcoming Super Bowl. The task force had a full week of proactive prostitution operations, where officials would look for indicators of human trafficking on websites. An undercover officer would reach out to the contact on the advertisement, schedule a date, and go determine who was at the location.

The undercover officer's cellphone rang because his team called "to see if [he] was okay" because "they were having issues hearing" through a one-way monitoring device. Still on the phone, the undercover officer confirmed the hotel room number, and then

there was a knock on the door, followed by 20 people coming in. The arriving officers pretended to arrest the undercover officer.

The officers took Barr downstairs "to a separate area." Then, one officer asked Barr what happened, and Barr explained that she was stuck in Miami with no money and no way to get home. At the time, Barr had $70 in cash and was saving that money to buy a train ticket to Connecticut.

Some of the officers took Barr to the police station, where she repeatedly told them "everything that happened to [her] while [she] w[as] in Miami." Barr was given food and clothes to wear, and she was taken to a room where she could sleep on a couch.

The next day, officers (1) asked Barr more questions in a transcribed interview under oath, (2) bought her a train ticket to Connecticut, and (3) took her to a safe house where she could stay until she left on the train.

**P.    Walker's Arrest**

Back at the Comfort Inn, other officers conducted surveillance and ultimately also detained A.H., King, and Walker. All three individuals were brought back to the police station, where they were interviewed. A.H. and King were later released.

## II. INDICTMENT AND PRETRIAL ISSUES

**A.    Superseding Indictment**

A superseding indictment charged Walker with (1) sex trafficking of an adult victim (Barr) by force, threats of force, or coercion, in violation of 18 U.S.C. § 1591(a)(1) and (b)(1) and 18

U.S.C. § 2 (Count 1); (2) sex trafficking of a minor victim (A.H.) by force, threats of force, or coercion and of a victim (A.H.) who had not attained the age of 18 years, in violation of 18 U.S.C. § 1591(a)(1), (b)(1), (b)(2), and (c) and 18 U.S.C. § 2 (Count 2); and (3) transporting an individual (King) to engage in sexual activity, in violation of 18 U.S.C. § 2421(a) (Count 3). Walker pleaded not guilty.

**B.    Notice of Expert Testimony**

Before trial, the government filed a notice of expert testimony pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G). The notice identified Special Agent Loff as the government's expert and indicated that "a summary of [his] [t]raining and [q]ualifications . . . ha[d] been provided to the defense."

The government's notice explained that Special Agent Loff would (1) testify about cellular telephone data extraction and preservation, "practices and methods used to advertise and manage persons who engage in commercial sex acts," and terminology used in human trafficking and (2) opine that the advertisements, methods, and terminology used by Walker and the victims were "consistent with the engagement in commercial sex acts."

Walker moved to (1) exclude Special Agent Loff's expert testimony, (2) demand further notice regarding his expert testimony, and (3) request a *Daubert*[8] hearing ("Walker's Motion").

---

[8] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

Walker objected to the government's notice on several bases: (1) allowing Special Agent Loff's testimony risked invading the province of the jury in areas where expert testimony was unnecessary and unhelpful; and (2) the government's notice was insufficiently specific as to Special Agent Loff's qualifications as well as the content of, and basis for, his expected testimony.

After reviewing Special Agent Loff's curriculum vitae in camera, the district court agreed with Walker and found the government's notice was insufficient to satisfy its obligations under Rule 16(a)(1)(G). The district court ordered the government to file an amended notice containing a complete summary of Special Agent Loff's expert testimony, his opinions, the bases and reasons for those opinions, and a list of his qualifications.[9]

The government then filed a new notice of expert testimony, again identifying Special Agent Loff as its expert witness. This notice attached Special Agent Loff's full curriculum vitae and summarized his "training and qualifications in [both] the area of

---

[9] At the time, Rule 16(a)(1)(G) provided:

> At the defendant's request, the government must give to the defendant a written summary of any [expert] testimony that the government intends to use . . . during its case-in-chief at trial. . . . The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G) (2020).

extracting data from cellular telephones" as well as "the area of human trafficking."

Specifically, the government noted that Special Agent Loff (1) was "assigned to the Child Exploitation and Human Trafficking Task Force"; (2) "was recently named Human Trafficking Coordinator for the FBI-Miami Field Office"; (3) had participated in approximately 20 to 30 investigations and interviewed more than 50 victims, defendants, and prostitutes; and (4) was familiar with "the methods and tactics used by those engaged in human trafficking activities," "the methods of advertising trafficking victims for purposes of prostitution," and the terminology used to advertise commercial sex acts.

In addition, the government detailed Special Agent Loff's anticipated testimony regarding cellphone data extraction. Finally, the government explained that, "based on his training, experience, and knowledge," Special Agent Loff would testify about "the prostitution and trafficking of [A.H.] and [Barr]," specifically related to the use of internet advertisements on the website "skipthegames.com" that were consistent with advertisements for prostitution.

"[I]n light of" the government's new notice, the district court denied without prejudice Walker's Motion. Walker never claimed that the new notice was insufficient until his brief in this appeal.

**C.    Hearing on Motions in Limine**

Before trial, the district court held a hearing on the parties' motions in limine.

Walker contested the admissibility of evidence of a preexisting sexual relationship between Walker and A.H. based on Federal Rule of Evidence 403 and the Confrontation Clause. The government explained that the sexual relationship "[went] to the coercion."

In response, Walker argued that because A.H. never told law enforcement that "she was forced or threatened or coerced into a commercial sex act by the defendant," the government would have to prove coercion by "one, proving that the relationship happened, and, two, having their expert witness, [Special] Agent Loff, testify that, I guess, this is what happens in cases involving minors and individuals involved in commercial sex acts."

Ultimately, the district court allowed the prior-relationship evidence, finding that it was "inextricably intertwined and also offer[ed] evidence of preparation, plan, knowledge, absence of mistake, intent, so it would be admissible under [Federal Rule of Evidence] 404(b) also."

### III. JURY VERDICT, SENTENCE, AND APPEAL

After a seven-day trial, the jury found Walker guilty of all three counts in the indictment.

Walker's advisory guidelines range was 292 to 365 months. The district court sentenced Walker to 300 months on Count 1, 300

months on Count 2, and 120 months on Count 3, all to be served concurrently, to be followed by 25 years of supervised release.[10]

Walker timely appealed. During closing arguments, Walker conceded guilt as to Count 3 (King) and does not challenge that conviction on appeal.

## IV. SEX TRAFFICKING STATUTE

Both of Walker's challenged convictions are under 18 U.S.C. § 1591, which is entitled "Sex trafficking of children or by force, fraud, or coercion."

As relevant here, § 1591(a)(1) provides that a defendant commits the offense of sex trafficking if he (1) knowingly, in or affecting interstate commerce, transports a person (2) knowing, or in reckless disregard of the fact, *either*:

> [(i)] that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, *or* [(ii)] that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act . . . .

18 U.S.C. § 1591(a)(1) (emphasis added).

As to Barr in Count 1, the indictment charged Walker with using force, threats of force, or coercion, but not fraud. At trial, however, the government admitted that there was no evidence of

---

[10] Walker does not appeal his sentence.

any force or threats of force. Rather, the government proceeded under only a theory of coercion. Walker's appeal as to Barr in Count 1 focuses on the "coercion" element.

As to A.H. in Count 2, the government proceeded alternatively under two theories: her status as a minor and coercion. The jury completed a verdict form finding Walker guilty of Count 2 on both theories. That verdict form showed the following:

If you found the Defendant guilty as charged in Count 2, which of the following facts did you unanimously find the Defendant, **Edward Walker**, knew or recklessly disregarded?

(a) that means of force, threats of force, coercion, or any combination of such means would be used to cause INDIVIDUAL-A.H. to engage in a commercial sex act?



Yes                    No

(b) that INDIVIDUAL-A.H. had not attained the age of 18 years and would be caused to engage in a commercial sex act?



Yes                    No

Walker's conviction under the minor status theory carried a mandatory minimum of 10 years, whereas his conviction under the coercion theory carried a mandatory minimum of 15 years. *See id.* § 1591(b). During closing arguments, defense counsel conceded guilt as to A.H.'s status as a minor but maintained that Walker was not guilty under the coercion theory. Walker contends that his conviction under the coercion theory as to A.H. must be vacated because it depended on the government's expert testimony about how pimps use romantic relationships to coerce women into

prostitution, but the government's notice failed to sufficiently disclose that testimony.

We first address Count 1 as to Barr.

## V. COUNT 1 – BARR

As to Count 1, Walker argues that the government's evidence of coercion of Barr is insufficient to support his § 1591(a)(1) conviction because "Barr voluntarily decided to engage in prostitution [to get money for] a train ticket home when she stopped having fun."

Because Walker moved for a judgment of acquittal on this specific issue after the government rested and then renewed his motion for judgment of acquittal on this specific issue at the close of the evidence, he preserved this sufficiency issue for appeal. *Cf. United States v. Bichsel*, 156 F.3d 1148, 1150 (11th Cir. 1998).

"The district court's denial of the motions for a judgment of acquittal will be upheld if a reasonable trier of fact could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt." *United States v. Rodriguez*, 218 F.3d 1243, 1244 (11th Cir. 2000). We review the sufficiency of the evidence de novo, "viewing the evidence in the light most favorable to the government[] and drawing all reasonable factual inferences in favor of the jury's verdict." *United States v. Jimenez*, 564 F.3d 1280, 1284 (11th Cir. 2009).

Under § 1591(e)(2), coercion is defined as (1) "threats of serious harm to or physical restraint against any person"; (2) "any

scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person"; or (3) "the abuse or threatened abuse of law or the legal process."  18 U.S.C. § 1591(e)(2).  At trial, the government proceeded under the second theory of coercion.

"Serious harm," in turn, is "any harm, whether physical *or nonphysical*, including *psychological, financial, or reputational harm*, that is sufficiently serious, under all the surrounding circumstances, *to compel a reasonable person of the same background and in the same circumstances* to perform or to continue performing commercial sexual activity in order to avoid incurring that harm."  *Id.* § 1591(e)(5) (emphases added).

Here, a reasonable jury could have concluded beyond a reasonable doubt that Walker knew or was in reckless disregard of the fact that his conduct caused Barr to believe that not engaging in prostitution would result in harm so serious that it would compel a reasonable person of Barr's background and circumstances to perform a commercial sex act to avoid that harm. *See id.* § 1591.

First, there was evidence from which a reasonable jury could conclude that Walker had a "scheme" or "plan." *Id.* § 1591(e)(2)(B). Not only did Walker's social media presence demonstrate a general intent to pimp women—some of his milder postings refer to "Getting Her To Sell It," "break[ing] your bitch every morning," "giv[ing] her a new daily goal," and "deposit[ing game] into her"— Walker also specifically planned for Barr to engage in commercial

sex work in Miami. Walker even told King that Barr would "be better away from [Connecticut]" and "best" once "she realize[d] she c[ould] do very well with [their] program." Walker praised A.H. for using the IZM (i.e., knowledge of the pimping game) to get Barr "on board" for Miami. And before their arrival in Miami, Walker contacted his niece for "auditions at [her] folx place(s)" for his "team."

Second, there was evidence from which a reasonable jury could conclude that Walker's scheme or plan was "intended to cause [Barr] to believe that failure to perform a[] [commercial sex] act would result in serious harm." *Id.* § 1591(e)(2)(B). To begin with, although Barr was told that "everything would be taken care of" on the trip, Barr testified that, once the group arrived in Miami, Walker told the women that they needed to "talk to some guys" to gather funds for food and lodging. Barr added that Walker instructed the women "to walk around and see if somebody would . . . buy [them] some food and drinks, and then maybe afterward, they would want to probably hang out"—which the jury could infer meant having a "date" involving a commercial sex act.

Walker rationed the women's food, permitting them only a few "spoonfuls" of yogurt one morning because the group was short on money. And, after the women went out on the yacht, Walker and A.H. used Barr's cellphone to post an online advertisement for Barr to engage in a commercial sex act "because

[the women] weren't making any money" and the group had only one more night paid at the hotel.

Once the advertisement was posted, Walker directed Barr to answer her cellphone "[i]f men called for a date." When a man—the undercover officer—reached out, Walker ordered Barr to text or call him back. Then, once Barr set up the date, Walker drove her to the Comfort Inn and gave her condoms.

Moreover, the evidence showed that, when Barr learned that the group planned to stay in Miami longer than one week, Walker was actively unhelpful when Barr expressed a desire to go home. At one point, Walker ignored her plea. At another point, Walker suggested an airplane. But when Barr demurred out of fear of heights, Walker told her there was only one train per month traveling from Miami, Florida to Connecticut. A reasonable jury could view this evidence as Walker misleading Barr because trains actually leave Miami for Connecticut twice daily.

In short, a reasonable jury could view the evidence as showing that Walker intended Barr to believe that, if she did not engage in sex work, she was at risk of (1) losing her lodging in Miami, (2) continuing to go hungry, and (3) remaining stuck in an unfamiliar city hundreds of miles from her home and family.

Third, there was evidence from which a reasonable jury could conclude that Barr subjectively believed that she had to engage in commercial sex acts to avoid serious harm. Barr went out on the yacht for sex work to earn money for the train ticket home. And Barr felt like she had to go on the Comfort Inn date

because "when [she] tried to ask [Walker] if [she] c[ould] go home," she was ignored, and she had no money. Barr testified that she thought sex work was "literally . . . the only way" to get home because she had no other way to earn money.

Fourth, and finally, there was evidence from which a reasonable jury could conclude that a reasonable person with Barr's background and in her circumstances would feel compelled to engage in commercial sex acts to avoid serious harm. Barr did not finish high school, grew up in Section 8 housing where "money was tight," had never been to Miami before, and had almost no money with her on the trip. Barr was in an unfamiliar city hundreds of miles from home and entirely dependent on Walker for lodging, food, and transportation.

Walker faults Barr for not asking her mother or sister for help. This ignores that Barr testified that "money was tight" when she was growing up and she "d[id]n't really ask for much" from her mother and sister. Barr also testified that her family would help her out "with whatever money that they do have." That is evidenced by the fact that Barr's sister gave her $20 for pizza when Barr asked. But a $156 train ticket is nearly eight times that amount. A reasonable jury was entitled to infer that (1) Barr did not feel like she could ask for that much money from her sister and (2) Barr's sister did not have the means to pay for Barr's train ticket because Barr told her the cost of the train ticket, she knew how unhappy Barr was in Miami, and she knew about Barr's financial situation in light of her request for money to buy pizza.

Walker also faults Barr for not seeking help from law enforcement or otherwise using her cellphone to obtain help. The jury was entitled to credit Barr's testimony that she did not ask the undercover officer for help because she feared he would not care or, worse, would turn aggressive toward her. Similarly, a reasonable jury could conclude that a reasonable person with Barr's background could be at a loss for how to obtain help in an unfamiliar city with little money and no independent means of transportation.

To be clear, Walker does not win on sufficiency review by merely pointing to other, different evidence in the record that supports an acquittal. *See United States v. Toll*, 804 F.3d 1344, 1354 (11th Cir. 2015) ("The defendant must do more than put forth a reasonable hypothesis of innocence[] because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." (quotation marks omitted)).

In short, there was sufficient evidence of Walker's coercion with respect to Barr. We affirm Walker's conviction as to Count 1.

## VI. COUNT 2 – A.H.

As noted, Walker argues that his coercion conviction as to A.H. in Count 2 should be vacated because the evidence of coercion hinged on expert testimony that was not disclosed before trial, in violation of Federal Rule of Criminal Procedure 16(a)(1)(G). Walker contends that the government did not disclose

that its expert, Special Agent Loff, would testify about how pimps often use romantic relationships to coerce women to engage in prostitution. Walker claims that this prejudiced his defense because the expert testimony was critical to the government's coercion theory in Count 2 and Walker did not have a meaningful opportunity to rebut that testimony either through cross-examination or a rebuttal witness.

## A.    Plain Error Applies

We first explain why Walker did not adequately preserve this issue for appeal. "To preserve an issue for appeal, one must raise an objection that is sufficient to apprise the trial court and the opposing party of the particular grounds upon which appellate relief will later be sought." *United States v. Straub*, 508 F.3d 1003, 1011 (11th Cir. 2007) (quotation marks omitted). "The objection must be raised in such clear and simple language that the trial court may not misunderstand it." *Id.* (quotation marks omitted).

Here, after the government filed its amended Rule 16 notice, the district court denied without prejudice Walker's Motion. Walker filed nothing on the docket reasserting his Rule 16 objection as to the amended notice between the district court's denial of Walker's Motion and the trial. Walker also did not raise his Rule 16 concern at the hearing on the parties' motions in limine.

Then, during Special Agent Loff's testimony at trial, Walker did not object on Rule 16 grounds. Instead, Walker objected to Special Agent Loff's qualifications to testify as an expert in human trafficking—an issue Walker does not raise on appeal. And when

Special Agent Loff testified about how pimps use romantic relationships to coerce sex trafficking victims, Walker objected only once that the testimony "invad[ed] the province of the jury." Indeed, Walker concedes on appeal that is the objection he made.

Because Walker did not preserve this Rule 16 notice issue, our review is limited to a plain error analysis. *United States v. Ramirez-Flores*, 743 F.3d 816, 821 (11th Cir. 2014).

## B.    No Prejudice

"To prevail under the plain error standard, an appellant must show: (1) an error occurred; (2) the error was plain; (3) it affected his substantial rights; and (4) it seriously affected the fairness of the judicial proceedings." *Id.* at 822. We need not determine if any error occurred in the government's amended notice of Special Agent Loff's expert testimony because any such error so clearly did not affect Walker's substantial rights for two reasons.

First, Walker anticipated Special Agent Loff's testimony before trial. At the district court's hearing on the parties' motions in limine, which took place about two weeks before trial, the government defended its motion to admit evidence of the sexual relationship between Walker and A.H., asserting that it "[went] to the coercion." In response, defense counsel walked through how the government might use the sexual-relationship evidence to prove coercion. Specifically, defense counsel theorized that the government could do that by "one, proving that the relationship happened, and, two, having their expert witness, [Special] Agent

Loff, testify that, I guess, this is what happens in cases involving minors and individuals involved in commercial sex acts."

That is what happened at trial. The government offered evidence of the relationship between Walker and A.H. through text messages and testimony from Barr and King. The government also offered testimony from Special Agent Loff about how coercion may "start[] under the guise of a relationship," but then "the pimp will build this future life goal with the victim" by talking about "travel[ing]" and a "luxurious lifestyle, and it will slowly develop [in]to" that they "need to make money" to achieve that goal, and "the only way [they] can make that money is if [the victim] engage[s] in these commercial sex acts." Special Agent Loff then opined that the text messages between Walker and A.H. were "consistent" with this pattern "based on [his] training and experience in other cases." Accordingly, because Walker anticipated Special Agent Loff's testimony, any error with the notice did not affect Walker's substantial rights.

Second, there was ample other sufficient evidence of coercion as to A.H. for a reasonable jury to convict Walker on Count 2. The jury learned that A.H. was a 15-year-old runaway when she met Walker, who was 44 or 45. The jury heard that Walker and A.H. lived together and they were in a romantic and sexual relationship but that he hired her out for sex. The jury saw text message conversations (1) where Walker instructed A.H. to "[t]ake some" in-calls because they "cant starve and die"; (2) where Walker told A.H., "Your feelings wont have me broke, looking

foolish and like a suckah. . . . I cant pimp according to your feelings[,] love," when A.H. complained about another woman; and (3) where Walker said he was "so disappointed" and threatened that "[t]his certainly w[ould] go no further if [he] c[ouldn't] talk to, direct[,] and preside over the [girls]."

A reasonable jury could conclude from this evidence that (1) A.H.'s young, runaway background and dependent circumstances made her particularly susceptible to sex trafficking and (2) A.H. feared that stopping the prostitution would result in serious harm in the form of losing Walker's emotional, psychological, and financial support. *See* 18 U.S.C. § 1591(e)(5) (defining serious harm as "any harm, whether physical or nonphysical, *including psychological[] [or] financial . . . harm*, that is sufficiently serious . . . to compel a reasonable person *of the same background and in the same circumstances* to perform . . . commercial sexual activity in order to avoid incurring that harm" (emphases added)).

Walker argues that the government's case was weak without Special Agent Loff's testimony that pimps often use romantic relationships to coerce women to engage in prostitution because "there was substantial evidence that [A.H.] was an eager and complicit participant in Mr. Walker's prostitution enterprise." To be sure, there was significant evidence of A.H.'s active involvement in recruiting new women and advertising the women's services. And, during her custodial interview, A.H. told law enforcement that she was "not th[e] type of girl" to be forced

into anything.  But the jury also heard Special Agent Loff testify that a bottom does what the pimp directs and delegates and a bottom can also be a victim of sex trafficking.  Walker's text messages to A.H. support Special Agent Loff's testimony in that regard.  We are bound to assume the jury found Special Agent Loff credible—and A.H. not credible—on this point.  *Jiminez*, 564 F.3d at 1285 ("[W]e assume that the jury made all credibility choices in support of the verdict.").

In sum, Special Agent Loff's testimony about how pimps often use romantic relationships to coerce women to engage in prostitution was a small part of a much larger case showing that Walker coerced A.H. to engage in prostitution.

## VII. CONCLUSION

We affirm Walker's convictions on Count 1 and the coercion theory in Count 2.

**AFFIRMED.**